JED S. RAKOFF, U.S.D.J.
Before the Court are the motions of defendants Mercuria Energy Trading, Inc. ("METI"), Mercuria Energy Asset Management, BV ("Mercuria EAM"), Mercuria Capital Partners Ltd. ("Mercuria Capital"), Mercuria US Asset Holdings, LLC ("Mercuria US Holdings") (collectively, the "Mercuria Parties"), Upstream Latinoamérica, S.L. ("ULA"), and Phoenix Global Resources pic ("Phoenix Global") to dismiss plaintiff's five-count complaint, ECF Nos. 21, 24, which asserts claims for breach of contract and of the duty of good faith and fair dealing, ECF No. 1. Plaintiff Jeffrey W. Miller alleges that defendants have breached their contractual obligations by denying him the redemption of his preferred Class A shares of ULA, to which he claims he is entitled pursuant to the ULA Articles of Association and his separation agreement with the Mercuria Parties.
Background
The pertinent allegations of the Complaint are as follows: Mercuria Energy Group Limited ("Mercuria EG" or "Mercuria"), which is not a party to this action, is a global energy and commodities trading company. Complaint ("Compl.") at ¶ 21, ECF No. 1. Mercuria EG does business in more than 50 countries and maintains 38 offices in 27 countries with over 1000 employees. Id. Defendants METI, Mercuria EAM, Mercuria Capital, and Mercuria US Holdings are subsidiaries or affiliates of Mercuria EG. See id. at ¶¶ 12-15.
Plaintiff Jeffrey W. Miller is an investment professional with experience in the global oil and gas exploration and production industry. Id. at ¶ 1. Miller began working for Mercuria EG at its global headquarters in Geneva, Switzerland on or about June 2008. Id. at ¶ 22. Miller subsequently moved to Texas and entered into an employment agreement with Mercuria's U.S. affiliate, METI, which is a Delaware corporation with its principal place of business in Greenwich, CT. Id. at ¶¶ 12, 22.
In late 2009, Miller negotiated and orchestrated Mercuria's acquisition of a lucrative oil and gas investment company known as Glacco Compania Petrolera S.A. ("Glacco"). Id. at ¶ 23. Glacco holds significant oil and gas assets throughout two provinces in Argentina. Id. at ¶ 25. Following the acquisition, Miller remained significantly involved with Glacco's governance and operations, serving as its Director and President. Id. at ¶ 27. Miller also negotiated an operating agreement with Roch S.A. ("Roch") to operate Glacco's oil and gas assets in Argentina. Id. at ¶ 26.
Mercuria created the company Upstream Latinoamérica, S.L. ("ULA") for the sole purpose of serving as Glacco's holding company. Id. at ¶ 2. ULA was incorporated and is domiciled in Spain. See id. at Ex. B-4 ("ULA Articles of Association").
*514 Guillaume Jean Roger Vermersch-who is also a founding member of Mercuria and serves as the director of, or is otherwise affiliated with, over twenty Mercuria entities-served as ULA's sole director and founder. Compl. at ¶¶ 28, 31.
In consideration for Miller's contribution to the Glacco acquisition, Vermersch sold Miller a carried interest in ULA consisting of all the ULA Class A preferred shares (the "JWM Glacco Carried Interest"), for a nominal fee (one Euro per share). Id. at ¶ 28; see also id. Ex. C at 2 (share purchase agreement). The balance of ULA's share capital, consisting of 7,996,800 ordinary Class B shares, was owned by Mercuria EAM. Id. at ¶ 32; see also ULA Articles of Association at 23-24.
The ULA Articles of Association provide that as the Class A preferred shareholder, Miller is entitled to a redemption of his shares in the event of the voluntary or compulsory dissolution or liquidation of the company and to receive the payment of a preferred liquidation quota upon such redemption. Compl. at ¶ 34. Article 14 of the Articles of Association defines the dissolution events that would trigger the preferred liquidation quota as follows:
The Company will be dissolved ... in the case that the Company assets directly or indirectly consist of shares in the capital of another operating company or companies, when (i) the Company proceeds to transfer all of its share capital or the majority of the control of the company or operating companies owned directly or indirectly by the Company to any third party, whether by sale, non-monetary contribution, structural modification or admission to list on a secondary official market; or (ii) such operating company or companies owned directly or indirectly by the Company proceed to transfer all or the majority of the assets resulting from its activities.
Id. at ¶ 35; see also ULA Articles of Association at art. 14.
Miller resigned from Mercuria in October 2012. Compl. at ¶ 36. In consequence, Miller and defendants METI, Mercuria Capital, Mercuria US Holdings, and Mercuria EAM (as well as another Mercuria affiliate, Mercuria Bakken, LLC) entered into a Mutual Release and Settlement Agreement (the "Separation Agreement"). Id. at ¶¶ 36-37; see also id. Ex. A-2 at p. 19, Ex. A-3 at p. 20. The Separation Agreement, among other things, addresses "the carried interests (or rights to carried interests) [Miller] maintain[ed] in certain Investments involving Mercuria (or certain of its affiliates)," including the JWM Glacco Carried Interest. Id. Ex. A-1 at p. 1.
With respect to the JWM Glacco Carried Interest, the Separation Agreement first states by way of background that Miller owns Class A shares that, "pursuant to the terms of ULA's Articles of Association," grant him "in certain predetermined scenarios, the right to receive a preferred liquidation quota equal to seven percent (7%) of the operating profit of ULA exceeding an investment rate of return of ten percent (10%)." Id. Ex. A-1 at p. 8. It further provides that Miller has "a predetermined redemption right if ULA and Glacco undergo certain reorganizations or structural modifications pursuant to the laws of Spain." Id. These rights are "subject always to the terms of ULA's Articles of Association." Id.
The Separation Agreement next describes a then-prospective merger between Mercuria and Roch, on which Miller had been working at the time of his resignation. Id. at ¶¶ 26, 29; Ex. A-1 at p. 9. Mercuria and Roch were then "intending to merge the various oil and gas interests in certain properties located in Argentina owned by each of them [i]ncluding, for ULA, all of the Santa Cruz upstream oil *515 and gas property portfolio owned by Glacco into either Roch or a new entity to be formed by Mercuria and Roch." Id. Ex. A-1 at p. 9. The Separation Agreement defines the company that would result from such a merger as "Mercuria/Roch NEWCO" and the holding company Mercuria and Roch envisioned forming as "HoldCo." Id.
Section V(B), entitled "Agreed Terms," provides that:
The intended merger process and formation of the Mercuria/Roch NEWCO described ... may (depending on the final structure agreed and implemented by Mercuria and Roch) trigger a redemption right pursuant to the terms of ULA's Articles of Association and, as applicable, the laws of Spain. [Miller] and Mercuria wish to agree to the formula based on which the preferred liquidation quota that [Miller's] Preferred Shares grant [him] ought to be valued in occurrence with either one of the Redemption Events (as defined below), provided, however, it is recognized ... that the provisions relative to the redemption of [Miller's] preferred shares are not applicable to the extent [he] elect[s], upon the formation of the Mercuria/Roch NEWCO, to exchange the Preferred Shares in ULA for ordinary shares in the Mercuria/Roch NEWCO in accordance with the ULA Articles of Association and the applicable laws of Spain or the relevant jurisdiction.
Id. Ex. A-1 at p. 9. The "Redemption Events" are defined as (1) an IPO Event, in which HoldCo would go public through an initial public offering on the Toronto Stock Exchange or a reverse merger with a listed entity (an event that was "anticipated, but in no way guaranteed") or (2) "a [completed] sale of the equity of the HoldCo ... with a third party pursuant to a fully negotiated and executed purchase and sale agreement and all ancillary documents thereto (the 'Equity Sale' ...)." Id. Ex. A-1 at p. 9, Ex. A-2 at p. 10.
Section V(B)(vi), titled "Governance of Preferred Shares," provides that "[Miller's] Preferred Shares and statutory rights in ULA (or its successor entity) shall at all times continue to be governed and construed, as applicable, in accordance with ULA's Articles of Association." Id. Ex. A-2 at p. 13. It continued, "[n]othing in this Settlement Agreement or specifically the provisions set forth in this Section V shall be interpreted or construed to override or otherwise conflict with any of the terms and conditions of ULA's Articles of Association." Id."To the extent of any such conflict, you and Mercuria BV [a/k/a Mercuria EAM] agree that the terms and conditions of ULA's Articles of Association ... shall prevail over this Settlement Agreement." Id.
Finally, the Separation Agreement contains the following forum selection clause: "Any action to enforce the terms of this Settlement Agreement, or arising from or relating to this Settlement Agreement, shall be brought in the United States Federal District Court for the Southern District of New York." Id. Ex. A-2 at p. 17. However, "[t]his Section ... is intended to only apply to this Settlement Agreement and the rights and obligations of you and Mercuria arising hereunder and is not intended to nor shall it be deemed to be a modification or amendment to any contract, document or other agreement between you and Mercuria (or any applicable affiliate of Mercuria) relative to the laws and jurisdiction governing any such contract, document or other agreement." Id.
On July 24, 2017, Mercuria announced that it was consolidating all of its Argentinian oil and gas interests with those of Andes Energia PLC ("Andes Energia"), a publicly listed company with its own oil and gas assets in Argentina. Id. at ¶ 49. As *516 part of this transaction (known as the "Phoenix Transaction"), Mercuria EAM entered into a share purchase agreement pursuant to which it sold the entirety of its shareholdings in ULA (that is, all the shares of ULA other than Miller's) to Trefoil Holdings B.V. ("Trefoil"), another Mercuria holding company. Compl. at ¶¶ 51, 55. Trefoil indirectly owned, through several of its subsidiaries (including ULA), 99.99% of the shares of PETSA, the operating company for Mercuria's Argentinian oil and gas exploration and production business (including Glacco). Id. at ¶ 51. Then, all of Trefoil Holding's shares were sold to Andes Energia. Andes Energia in turn sold about 75% of its shares (1,899,106,385 shares) to Upstream Capital Partners VI Limited ("Upstream Capital"), an indirectly wholly-owned subsidiary of Mercuria EG. See id. at ¶ 57; see also id. Ex. D at 1, 10, 11; Ex. E-1 at 15-17, 48; Ex. E-14 at 100-102. In addition, Mercuria EAM received 14,766, 666 shares of Phoenix Global. Id. at ¶ 57.
As a result of the Phoenix Transaction, Trefoil Holdings became a wholly-owned subsidiary of Andes, and the subsidiaries of Trefoil Holdings-including ULA-became indirect subsidiaries of Andes. Id. at ¶ 51. After completion of the merger, the combined entity was renamed, rebranded, and publicly traded as Phoenix Global Resources pic. ("Phoenix Global"). Id.
Phoenix Global is a public company now listed on the London Stock Exchange and the Buenos Aires Stock Exchange. Id. at ¶ 52. It is incorporated under the laws of England and Wales and its principal place of business is London, England. Affidavit of Nigel John Duxbury in Support of Defendant Phoenix Global Resources PLC's Motion to Dismiss for Lack of Personal Jurisdiction ("Duxbury Aff.") at ¶ 2, ECF No. 26.
On September 8, 2017, Miller, through his counsel, sent a formal demand letter to in-house counsel for Mercuria Energy Trading SA demanding payment of the JWM Glacco Carried Interest. Compl. at ¶ 61. Mercuria, through its outside counsel, responded with a rejection of Miller's demand. Id. Miller filed the instant action on November 14, 2017. See id.
The Complaint asserts five claims: breach of the Articles of Association against ULA (Count I), breach of contract and of the implied covenant of good faith and fair dealing against the Mercuria Parties (Counts II and III), and breach of contract and of the implied covenant of good faith and fair dealing against Phoenix Global (Counts IV and V).See Compl. at 18-24. The Mercuria Parties, Phoenix Global, and ULA all move to dismiss the complaint. See ECF Nos. 21, 24.
After full briefing, the Court heard oral argument on defendants' motions on February 8, 2018, see ECF No. 40. The Court now rules as follows:
Counts II and III (Mercuria Parties)
The Mercuria Parties move to dismiss Counts II and III under Federal Rule of Civil Procedure 12(b)(6). See Memorandum of Law in Support of the Mercuria Defendants' Motion to Dismiss Counts II and III of the Complaint ("Mercuria Mem."), ECF No. 22. To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). Mere conclusory statements in a complaint and "formulaic recitation[s] of the elements of a cause of action" are not sufficient. Twombly, 550 U.S. at 555, 127 S.Ct. 1955.
In considering a Rule 12(b)(6) motion, while the court generally looks to "the *517 allegations on the face of the complaint," "the court may permissibly consider ... [d]ocuments that are attached to the complaint or incorporated in it by reference," such as here, the Separation Agreement. Such documents "are deemed part of the pleading." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).
A. Count II: Breach of Contract
The parties agree that the Separation Agreement is governed by New York law. "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). Here, the parties dispute only whether the Mercuria Parties breached the Separation Agreement. Specifically, the Mercuria Parties contend that the Separation Agreement provides Miller rights only in the event of the Roch Merger, which never materialized, whereas Miller argues that his rights under the Separation Agreement are triggered by the Phoenix Transaction because (i) the Separation Agreement incorporates the ULA Articles of Association by reference, and (ii) the Separation Agreement's references to the Roch Merger were merely illustrative.
With respect to incorporation by reference, "[p]arties to a contract are plainly free to incorporate by reference, and bind themselves inter sese to, terms that may be found in other agreements to which they are not a party." Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Engineers, AFL-CIO, 24 F.3d 447, 449 (2d Cir. 1994). To determine whether a contract has incorporated a document by reference, courts look to whether a reasonable person would understand the specific document to be incorporated by reference, in other words, an objective standard. Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 47 (2d Cir. 1993). Courts consider two factors in making this determination: (1) whether the allegedly incorporated document is expressly identified and "so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt." Chiacchia v. Nat'l Westminster Bank USA, 124 A.D.2d 626, 628, 507 N.Y.S.2d 888 (1986) ; and (2) whether the language incorporating the document "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract." Nat'l Union Fire Insurance of Pittsburg v. Beelman Truck Co., 203 F.Supp.3d 312, 322 (S.D.N.Y. 2016) (internal quotation omitted).
The Separation Agreement clearly identifies the ULA Articles of Association. The agreement's references to and discussion of the Articles of Association include:
• "[Y]ou currently hold 3,200 Class A Preferred Shares (the 'Preferred Shares') in [ULA], which pursuant to the terms of ULA's Articles of Association grant you, in certain predetermined scenarios, the right to receive a preferred liquidation quota." Compl. Ex. A-1 at p. 8.
• "[T]he rights ... [are] subject always to the terms of ULA's Articles of Association." Id.
• "[T]he provisions relative to the redemption of your Preferred Shares are not applicable to the extent you elect ... to exchange the Preferred Shares [i]n ULA for ordinary shares in the Mercuria/Roch NEWCO in accordance with the ULA Articles of Association and the applicable laws of Spain or the relevant jurisdiction." Id. Ex. A-1 at p. 9.
• "[Y]our preferred shares and statutory rights in ULA (or its successor entity) shall at all times continue to be governed by and construed, as *518 applicable, in accordance with ULA's Articles of Association." Id. Ex. A-2 at p. 13.
• "Barring either one of the Redemption Events occurring, insofar as you had not exercised the JWM Share Exchange Election, the JWM Glacco Carried Interest at all times be dealt with pursuant to and in accordance with ULA's Articles of Association (or, as applicable, the governing documents of any successor entity)." Id. Ex. A-2 at p. 14.
Since the Separation Agreement both refers to the ULA Articles of Association by name repeatedly and discusses it a manner that leaves a reader with no reasonable doubt as to which document is referenced, the Court finds that the ULA Articles of Association are "expressly referenced" in the Separation Agreement.
The second factor, clear communication of the intent to incorporate, also is met, since the language does more than just expressly identify the ULA Articles of Association. See Intesa Sanpaolo, S.p.A. v. Credit Agricole & Inv. Bank, 2013 WL 4856199, at *3 (S.D.N.Y. Sept. 10, 2013). However, incorporation by reference is limited to the section and purpose for which the incorporated document is identified. Id. at *4 (" '[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it part of their agreement only for the purpose specified.' " (quoting Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp., 534 F.2d 422, 441 (2d Cir. 1975) ) ); see also CooperVision, Inc. v. Intek Integration Techs., Inc., 7 Misc.3d 592, 794 N.Y.S.2d 812, 819 (N.Y. Sup. Ct. 2005) ("The well settled rule is that 'a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.' " (quoting Guerini Stone Co. v. P.J. Carlin Constr. Co., 240 U.S. 264, 278-79, 36 S.Ct. 300, 60 L.Ed. 636 (1916) ) ); see also 17A Am. Jur. 2d Contracts § 381 ("If ... a reference is made to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified.").
Here, the Separation Agreement incorporates the ULA Articles of Association for the limited purpose of governing when Miller's redemption rights are triggered, only at which point the Mercuria Parties' obligations under the Separation Agreement with respect to the JWM Glacco Carried Interest would in turn come into force. The Separation Agreement "in no way manifest[s] any intent that" the Mercuria Parties intended to undertake all of ULA's obligations under the Articles of Association. See Veleron Holding, B.V. v. BNP Paribas SA, 2014 WL 12699263, at *18-19 (S.D.N.Y. Apr. 16, 2014). Therefore, the limited incorporation of the Articles of Association does not impose any obligations on the Mercuria Parties with respect to the JWM Glacco Carried Interest except in the event of the Roch Merger.[1]
*519 Nor does the Separation Agreement otherwise grant Miller any rights relative to the JWM Glacco Carried Interest in the absence of a Roch Merger. "The cardinal principle for the construction and interpretation of ... all contracts ... is that the intentions of the parties should control." SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006). "[T]he best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, it] must be enforced according to the plain meaning of its terms.' " Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002) ). Accordingly, "if 'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.' " Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) (quoting Ruttenberg v. Davidge Data Sys. Corp., 215 A.D.2d 191, 192-93, 626 N.Y.S.2d 174 (1st Dep't 1995) ).
Miller argues that the valuation methodology set forth in the Separation Agreement applies to the redemption of the JWM Glacco Carried Interest triggered by the Phoenix Transaction because the example of the Mercuria/Roch merger was merely an illustration "to provide clarification on the value of the JWM Glacco Carried Interest in the event that Glacco and ULA underwent the type of merger sequence described." Plaintiff Jeffrey W. Miller's Memorandum of Law in Opposition to the Mercuria Defendants' motion to Dismiss ("Pl. Mercuria Mem.") at 17, ECF No. 35.[2] But every single one of the defined terms used in Section V to describe the circumstances that would give rise to a "Redemption Event" and trigger the use of the valuation formula is premised on, and derivative of, the Roch merger.[3] The Separation Agreement there unambiguously provides that the rights it grants Miller relative to his JWM Glacco Carried Interest arise only in specific situations following *520 the Roch Merger-specifically, an IPO Event or an Equity Sale-and, further, that the Roch Merger might not come to fruition. The Roch Merger did not, in fact, occur. Accordingly, it follows that Miller is not entitled to redemption of his preferred shares or any preferred liquidation right under the Separation Agreement.
Because the Separation Agreement does not incorporate the Articles of Association and its plain terms impose an obligation on the Mercuria Parties only in the event of a Roch Merger that never materialized, the Mercuria Parties are not in breach of the Separation Agreement, and Count II is dismissed.
B. Count III: Breach of the Duty of Good Faith and Fair Dealing
Count III alleges that "[a]s a result of the Phoenix Transaction, the Mercuria Parties are obligated pursuant to the Separation Agreement to redeem the JWM Glacco Carried Interest," Compl. ¶ 84, and that, accordingly, "[t]he Mercuria Parties have acted in bad faith by rejecting Mr. Miller's demands for payment of the JWM Glacco Carried Interest and failing to pay Mr. Miller the amount owed him under the Separation Agreement,"id. at ¶ 85. However, "[t]he cause of action for breach of the implied covenant of good faith and fair dealing cannot be maintained [where] it is premised on the same conduct that underlies the breach of contract cause of action and is intrinsically tied to the damages allegedly resulting from a breach of the contract." MBIA Ins. Corp. v. Merrill Lynch, 81 A.D.3d 419, 419-420, 916 N.Y.S.2d 54 (1st Dep't 2011) (internal quotation omitted); see also Goodrich Capital, LLC v. Vector Capital Corp., 11-CV-9247, 2012 WL 4123401, at *5 (S.D.N.Y. June 26, 2012) (dismissing claims for breach of the implied covenant of good faith and fair dealing where the claim "merely duplicate[s] the ... theories on which plaintiffs have based their breach of contract claims").
Miller's claim for breach of the implied covenant of good faith and fair dealing is premised on exactly the same conduct as his claim for breach of the Separation Agreement. Indeed, it alleges the same exact damages. Count II alleges that "[t]he Mercuria Parties have breached their obligations to Mr. Miller under the terms of the Separation Agreement" and "have failed and refused to pay Mr. Miller the amount owed to him under the Separation Agreement" resulting from an the Phoenix Transaction, asserting damages "in an amount not less than $32,600,000 plus interest from August 10, 2017." Compl. ¶¶ 79-80. Count III almost identically alleges that: "[a]s a result of the Phoenix Transaction, the Mercuria Parties are obligated pursuant to the Separation Agreement to redeem the JWM Glacco Carried Interest" and that "[t]he Mercuria Parties have acted in bad faith" and "have wrongfully and intentionally breached the duty of good faith and fair dealing by denying Mr. Miller the benefits to which he is entitled under the Separation Agreement," again asserting resulting damages "in an amount not less than $32,600,000 plus interest from August 10, 2017." Id. at ¶¶ 84-86.
Miller nevertheless contends that Count III is not duplicative of Count II because Count II alleges breach of the Separation Agreement whereas Count III alleges a breach of the implied covenant of good faith and fair dealing arising from the Mercuria Parties' failure to redeem Miller's preferred shares pursuant to the terms of ULA's Articles of Association. Therefore, he argues, damages under Count III are governed by the Mercuria Parties' threshold agreement to redeem the JWM Glacco Carried Interest pursuant to the Articles of Association, whereas *521 damages under Count II are governed by Section V(B) of the Separation Agreement, which describes a specific valuation methodology for the JWM Glacco Carried Interest. See Pl. Mercuria Mem. at 23. Even setting aside the Court's foregoing conclusion that the Separation Agreement does not incorporate the ULA Articles of Association to the extent Miller claims, Miller's argument fails: Either the ULA Articles of Association are incorporated by reference into Section V of the Separation Agreement, in which case Count III is duplicative of Count II, or they are not incorporated by reference, in which case the Mercuria Parties have no obligation to redeem Miller's rights under the ULA Articles of Association and accordingly cannot have breached the duty of good faith and fair dealing by failing to do so. In short, Count III must also be dismissed.[4]
Counts I, IV, and V (Phoenix Global and ULA)
Phoenix Global and ULA move to dismiss Counts I, IV, and V under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Phoenix Global additionally moves to dismiss Counts IV and V under Rule 12(b)(6) for failure to state a claim. See Memorandum of Law in Support of Defendants Phoenix Global Resources PLC's and Upstream Latinoamérica, S.A.'s Motion to Dismiss Counts I, IV, and V of the Complaint ("Phoenix and ULA Mem."), ECF No. 25.
"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 242 (2d Cir. 2007) (internal quotation omitted). To do so, the plaintiff must "plead[ ] good faith allegations sufficient to establish jurisdiction." Newman v. Capitol Life Ins. Co., 45 F.Supp.3d 376, 378 (S.D.N.Y. 2014). The plaintiff "must make allegations establishing jurisdiction with some 'factual specificity' and cannot establish jurisdiction through conclusory assertions alone." Cont'l Indus. Grp. v. Equate Petrochemical Co., 586 Fed.Appx. 768, 769 (2d Cir. 2014).
"In assessing whether personal jurisdiction is authorized, 'the court must first look to the long-arm statute of the forum state, in this instance New York.' " Whitaker v. American Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001) (quoting Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997) ). "In New York, general jurisdiction is governed by N.Y. CPLR § 301. Section 301 preserves the common law notion that 'a court may exercise general jurisdiction over a nondomiciliary defendant if the defendant is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction.' " Thackurdeen v. Duke Univ., 130 F.Supp.3d 792, 798 (S.D.N.Y. 2015) (quoting Chatwal Hotels & Resorts LLC v. Dollywood Co., 90 F.Supp.3d 97, 103 (S.D.N.Y. 2015) ). The Supreme Court has further made clear that a corporate defendant is subject to general jurisdiction only in its (i) place of incorporation and (ii) principle place of business, unless (iii) the "exceptional case" exists in which the foreign defendant's contacts with the forum state is "so substantial and of such a nature as to render the corporation 'at home' in" the forum state. SPV OSUS Ltd. v. UBS AG, 114 F.Supp.3d 161, 168 (S.D.N.Y. 2015), aff'd *522 882 F.3d 333 (2d Cir. 2018) (quoting Daimler AG v. Bauman, 571 U.S. 117, 134 S.Ct. 746, 761 n.19, 187 L.Ed.2d 624 (2014) ).
To determine whether it has specific jurisdiction under N.Y. CPLR § 302(a)(1), "a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." Best Van Lines, Inc., 490 F.3d at 246 (quoting Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 818 N.Y.S.2d 164, 850 N.E.2d 1140, 1142 (2006) ). Under the first prong, the defendant must have transacted business "in such a way that it constitutes purposeful activity," i.e."some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Id. at 253 (internal quotations omitted). Under the second prong, "a claim aris[es] from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." Id. at 249 (internal quotations omitted).
Miller argues that this Court has jurisdiction over both ULA and Phoenix Global. But ULA is a company incorporated in Spain, with its principal place of business in Madrid, that has never engaged directly or indirectly in any business in New York, has never been licensed, qualified, or registered to conduct business in New York, and has never maintained any office, place of business, mailing address, bank account, or telephone listing in New York. Affidavit of Guillaume Vermersch in Support of Defendant Upstream Latinoamérica, S.L.'s Motion to Dismiss for Lack of Personal Jurisdiction ("Vermersch Aff.") at ¶¶ 2-9, ECF No. 27. Similarly, Phoenix Global is a company incorporated in England and Wales, with its principal place of business in London, whose only connection to New York is its arrangement with the Bank of New York to offer American Depository Receipts ("ADRs") referencing Phoenix Global's ordinary shares that trade on the London Stock Exchange. Duxbury Aff. at ¶¶ 2, 11.
Miller nevertheless claims personal jurisdiction because of the forum selection clause in the Separation Agreement.[5] It is true that the fact a party is a non-signatory to an agreement is frequently "insufficient, standing alone, to preclude *523 enforcement of a forum selection clause." Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 701 (2d Cir. 2009). "[W]here the alleged conduct of the nonparties is closely related to the contractual relationship, a range of participants, parties and nonparties, should benefit from and be subject to forum selection clauses." Magi XXI, Inc. v. Stato della Citta del Vaticano, 714 F.3d 714, 722 (2d Cir. 2013) (internal quotation omitted). The case law makes clear that "closely related" in this sense is a fairly strict standard. Thus, according to one court in this District, "[i]n order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound.' " Nanopierce Tech., Inc. v. Southridge Capital Mgmt., No. 02-0767, 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4, 2003) (quoting Lipcon v. Underwriters at Lloyd's London, 148 F.3d 1285, 1299 (11th Cir. 1998) ). Or, according to another court in this District, "a non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct." Weingrad v. Telepathy, Inc., No. 05-CV-2024, 2005 WL 2990645, at *5 (S.D.N.Y. Nov. 7, 2005) (quoting Lipcon, 148 F.3d at 1299 ; see also KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC, 812 F.Supp.2d 377, 386 (S.D.N.Y. 2011). This is relevant, or irrelevant, to Counts I, IV, and V as follows:
A. ULA (Count I)
With respect to Count I, the Court need not reach the question whether ULA is sufficiently closely related to the Mercuria Parties to be bound by the forum selection clause in the Separation Agreement because the forum selection clause does not govern the claim that Miller brings against ULA.
Miller has sued ULA for breach of the ULA Articles of Association. The forum selection clause expressly provides that it "is intended to only apply to this Settlement Agreement and the rights and obligations of you and Mercuria arising hereunder." Compl. Ex. A-2 at 17. The forum selection clause further disclaims that it affects any other contracts between Miller and Mercuria or its affiliates. See id. (this clause "is not intended to nor shall it be deemed to be a modification or amendment to any contract, document or other agreement between you and Mercuria (or any applicable affiliate of Mercuria) relative to the laws and jurisdiction governing any such contract, document or other agreement, the provisions of which shall remain in full force and effect as written therein."). Therefore, the forum selection clause does not modify the laws and jurisdiction that govern ULA's relationship with Miller pursuant to the Articles of Association and this Court lacks personal jurisdiction over ULA with respect to Count I, the only count brought against ULA.
B. Phoenix Global (Counts IV and V)
Miller offers three reasons to find Phoenix Global sufficiently "closely related" to the Mercuria Parties and the Separation Agreement to be bound by the forum selection clause: (1) Mercuria EG, the parent company of all the Mercuria Parties, is a majority owner of Phoenix Global; (2) Phoenix Global now holds the Glacco oil field assets (and relatedly, now holds all the ULA shares that Mercuria EAM once held); and (3) "Mercuria" holds three seats on Phoenix Global's board. Specifically, Anuj Sharma, the head of Mercuria EG's Argentine subsidiaries, was appointed Phoenix Global's Chief Executive Officer; Matthieu Milandri, the Investment Director at METI, was appointed as Director of Phoenix Global; and, most significantly, Guillaume Vermersch, the sole director of ULA, was appointed as Director of Phoenix Global. Compl. Ex. E-1 at 24-26. In *524 addition, Mercuria EAM now owns a relatively small number of Phoenix Global shares.
Phoenix Global argues that it is not closely related because it could not have foreseen that it would be subject to the forum selection clause, given that the Separation Agreement was executed prior to Phoenix Global's involvement in the underlying transactions at issue. That is not dispositive, however, since the same is true of successors-in-interest, who "unquestionably fit within the definition of closely related." KTV Media Intern., Inc., 812 F.Supp.2d at 386.
Nevertheless, the Court finds that Phoenix Global could not have foreseen that it would be subject to the forum selection clause, and does not otherwise satisfy the "closely related" test, for two reasons. First, the relationship between Phoenix Global and the Mercuria Parties is more attenuated than the relationships courts have previously found sufficiently close to bind non-signatories to a forum selection clause. For example, in Electric Mobile Cars, LLC v. Electric Mobile Cars, Inc., the court found a close relationship between a signatory and non-signatory that were alter egos. No. 12-CV-5202, 2012 WL 5264454, at *2 (S.D.N.Y. Oct. 17, 2012) ; see also LaRoss Partners, LLC v. Contact 911 Inc., 874 F.Supp.2d 147, 160-61 (E.D.N.Y. 2012) (non-signatory and signatory were closely related based on plaintiff's allegations that created an inference that the non-signatory functioned essentially, and exclusively, as a subsidiary of signatory). Similarly, in Firefly Equities, LLC v. Ultimate Combustion Co., the non-signatory found "closely related" to the signatory company was the company's president and had signed the agreement containing the forum selection clause on behalf of the company. 736 F.Supp.2d 797, 798-99 (S.D.N.Y. 2010).
One of the cases relied on most heavily by plaintiff, Metro-Goldwyn-Mayer Studios v. Canal+ Distribution S.A.S., No. 07-CV-2918, 2010 WL 537583 (S.D.N.Y. Feb. 9, 2010), involved more indirect relationships but those relationships, too, were closer than the one between Phoenix Global and the Mercuria Parties. In Metro-Goldwyn-Mayer Studios, non-signatory Groupe Canal owned 65% of non-signatory Canal & France, which owned 100% of Canals & Distribution, which was the successor-in-interest of TPS, the signatory to the contract. Id. at *5. The relationships between the entities were vertical: every entity found closely related to the signatory had an ownership (or ownership-like, in the case of the successor-in-interest) relationship with the signatory. Here, by contrast, the relationship between Phoenix Global and the Mercuria Parties is primarily horizontal, as they are both owned, to varying degrees, by Mercuria EG. As a result, Phoenix Global's interests are not "completely derivative of and directly related to, if not predicated upon, the signatory party's interests or conduct." Weingrad, 2005 WL 2990645, at *5.
The second (and related) reason this Court finds Phoenix Global and the Mercuria Parties insufficiently closely related to render Phoenix Global bound by the forum selection clause is that Phoenix Global did not play an active role in the transaction giving rise to plaintiff's claims, i.e. plaintiff's denial of his right to redeem his preferred shares. "The vast majority of cases that have found a nonsignatory bound by a forum selection clause under the theory that they are 'closely related' to the dispute or the signatory, have done so where the non-signatory had a far more active role in the transaction." Leviton Mfg. Co. v. Reeve, 942 F.Supp.2d 244, 259 (E.D.N.Y. 2013), amended (Mar. 23, 2013). That "the enforcement of the forum selection clause against the non-party must *525 have been foreseeable prior to suit ... implies that the nonsignatory must have been otherwise involved in the transaction in some manner." Recurrent Capital Bridge Fund I, LLC v. ISR Sys. & Sensors Corp., 875 F.Supp.2d 297, 307-08 (S.D.N.Y. 2012) ; see also Prospect Funding Holdings, LLC v. Vinson, 256 F.Supp.3d 318, 325 (S.D.N.Y. 2017) ; KTV Media Intern., 812 F.Supp.2d at 386-87 (plaintiff's claims "completely derive[d] from and directly relate[d] to [non-signatory's] conduct.").
Here, while Phoenix Global is the product of a transaction that arguably triggers Miller's right to a preferred liquidation quota under the ULA Articles of Association, there is no allegation in the complaint that Phoenix Global acted in concert with any of the Mercuria Parties to deny Miller his preferred liquidation quota. Moreover, there is little reason to think that Phoenix Global would have been put on notice, as a result of the share exchange between Trefoil Holdings and Andes Energia, of the forum selection clause in a separation agreement between various other Mercuria entities and a former Mercuria employee, simply because the separation agreement addressed (among other things) the Class A preferred shares of ULA, one of Phoenix Global's (many) subsidiaries.
Miller also argues that Phoenix Global is a successor-in-interest to ULA and therefore subject to the forum selection clause on that basis. "[I]f successorship is established, a non-signatory is subject to the ... presumption of the enforceability of mandatory forum selection clauses." Aguas Lenders Recovery Grp., 585 F.3d at 701. However, even assuming arguendo that ULA is itself subject to the forum selection clause, Phoenix Global is not. The Court notes, as an initial matter, that Miller has not identified a single case where a court enforced a forum selection clause against a successor-in-interest to a non-signatory bound by a forum selection clause because of its close relationship to the transaction (as opposed to a successor-in-interest to a signatory to a forum selection clause).
More fundamentally, the law views corporations as entities "endowed with a separate and distinct existence from that of its owners. Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, ... which is entitled to substantial weight." Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988). "Under New York law, there are at least three ways in which a corporation can acquire the business of another: The purchaser can buy the seller's capital stock, it can buy the seller's assets, or it can merge with the seller to form a single corporation." Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44-45 (2d Cir. 2003). "In the first case, the purchaser does not become liable for the seller's debts unless the stringent requirements for piercing the corporate veil are met." Id. at 45. In the third case, by contrast, when two corporations merge to become a single entity, the successor corporation becomes automatically liable for the debts of both predecessors. Id. But no such merger occurred here.
This leaves the second case. As a general rule, "a corporation purchasing the assets of another is not liable for the debts and liabilities of the seller." Golub v. Kidder, Peabody & Co., No. 89-CV-5903, 2000 WL 1024688, at * *4 (S.D.N.Y. July 25, 2000) ; see also Cargo Partner AG, 352 F.3d at 45. The successor liability doctrine furnishes a narrow exception to that general rule in four circumstances: (1) where the purchaser expressly assumed the predecessor's liability, (2) where there was a consolidation or de facto merger of seller *526 and purchaser, (3) where the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations. Golub, 2000 WL 1024688, at *4.
Phoenix Global argues that the successor liability doctrine has no application because the Phoenix Transaction involved a purchase of shares. Specifically, Andes Energia agreed "to acquire the entire issued share capital of Trefoil Holdings," Compl. Ex. D at p. 11, the parent company of ULA. Therefore, Phoenix Global, though the Phoenix Transaction, bought 99.6% of the shares of ULA.
In response, Miller contends that notwithstanding that the Phoenix Transaction was effected by a share exchange, it was in actuality a "combination of assets." He cites the fact that in exchange for selling Trefoil holdings, Mercuria's Upstream Capital in turn received shares of Phoenix Global, which resulted in its 75% ownership of Phoenix Global. But plaintiff does not explain why an exchange of shares, as opposed to a one-sided purchase, is tantamount to a purchase of assets. And while plaintiff cites documents describing the transaction as a "combination" of Mercuria and Andes Energia's oil and gas "asset bases in Argentina," Compl. Ex. E-1, pp. 1, 8, two companies can "combine" their asset bases through a share purchase. Plaintiff cites no case where a transaction was structured as a share purchase but nevertheless treated as an asset purchase for purposes of the successor-in-interest test.
Since, therefore, Phoenix Global is not ULA's successor-in-interest, it could only be bound by the forum selection clause (again, assuming arguendo that ULA is bound by the forum selection clause) if ULA and Phoenix Global's "separate corporate structures should be disregarded under the doctrine of corporate veil-piercing." Golub, 2000 WL 1024688, at *4. "Those seeking to pierce a corporate veil ... bear a heavy burden of showing that the corporation was dominated as to the transaction attacked and that such domination was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences." TNS Holdings, Inc. v. MKI Securities Corp., 92 N.Y.2d 335, 680 N.Y.S.2d 891, 703 N.E.2d 749, 751 (1998). Plaintiff does not argue in his opposition that the corporate veil should be pierced, nor does the complaint contain any allegations indicating that it should. Consequently, Counts IV and V must be dismissed for want of jurisdiction.[6]
In short, for all the foregoing reasons, the Complaint is dismissed in its entirety. Clerk to enter judgment.
SO ORDERED.

By contrast, courts have found more complete incorporation where a contract states that it itself is subject to, or should be construed "in accordance with," another agreement. See, e.g., Progressive Cas. Ins. Co., 991 F.2d at 46-47 (clause in an insurance agreement stated that the agreement was "Subject to Facultative Reinsurance Agreement"); Contec Corp. v. Remote Solution, Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005) (agreement that provided that any dispute under the agreement "shall be determined ... in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA')" incorporated the AAA's rules); One Beacon Ins. Co. v. Crowley Marine Servs., Inc., 648 F.3d 258, 263, 267-68 (5th Cir. 2011) (contract was to be construed "IN ACCORDANCE WITH THE PURCHASE ORDER TERMS & CONDITIONS ON" a specified website).

Miller also contends that it would be contrary to the custom and usage of carried interest in private equity to read the Separation Agreement as governing only a merger between Mercuria and Roch. See Pl. Mercuria Mem. at 18-20. But there is no ambiguity in the language of the Separation Agreement, and custom and usage is immaterial where the plain language of the contract controls. See Croce v. Kurnit, 737 F.2d 229, 238 (2d Cir. 1984) ("[E]vidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties.").

Section V concerns "the formula based on which the preferred liquidation quota that [Miller's] Preferred Shares grant [him] ought to be valued with the occurrence of" either an IPO Event or an Equity Sale, where those terms are defined, respectively, as the sale of the equity of the HoldCo with a third party pursuant to a fully negotiated and executed purchase and sale agreement and the initial public offering of HoldCo on the Toronto Stock Exchange or a reverse merger with a listed entity. See Compl. Ex. A-1 at p. 9, Ex. A-2 at p. 10. HoldCo, in turn, is defined as the holding company for Mercuria/Roch NEWCO, which is defined as the new entity to be formed by Mercuria and Roch. The Separation Agreement explains that "[t]here will be no re-valuation of or valuation adjustment to the JWM Glacco Carried Interest" until the IPO Event or the Equity Sale. See also id. Ex. A-2 at p. 11 ("It is hereby agreed that, only in relation to the Redemption Events ... and in the absence of a JWM Share Exchange Election having been made at Merger, you will be entitled to fully redeem your existing Preferred Shares."); see also id. Ex. A-2 at p. 14 ("Barring either one of the Redemption Events occurring, insofar as you had not exercised the JWM Share Exchange Election, the JWM Glacco Carried Interest will at all times be dealt with pursuant to and in accordance with ULA's Articles of Association.").

This is true even though the breach of the duty of good faith and fair dealing is pled in the alternative. See, e.g., Alaska Elec. Pension Fund v. Bank of Am. Corp., 175 F.Supp.3d 44, 63-64 (S.D.N.Y. 2016) (dismissing implied covenant claim pleaded in the alternative because it was "based on the exact same allegations" as its breach of contract claim); Commerzbank AG v. HSBC Bank USA, No. 15-CV-10032, 2016 WL 3211978, at *3-4 (S.D.N.Y. June 8, 2016) (same).

Miller has not argued that this Court has general jurisdiction or specific jurisdiction over ULA or Phoenix Global on any ground other than the forum selection clause. Nor could he. The only connection that either defendant has to New York is Phoenix Global's ADRs. This contact is not enough, standing alone, to confer jurisdiction. "[T]he prevailing caselaw accords foreign corporations substantial latitude to list their securities on New York-based stock exchanges and to take the steps necessary to facilitate those listings (such as making SEC filings and designating a depositary for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 97 (2d Cir. 2000) ; see alsoid. ("[J]urisdiction is not available over a corporation whose only contacts with the form are listings on the New York stock exchanges and ancillary arrangements involving the distribution of their shares."); Glencore AG v. Bharat Aluminum Co. Ltd., No. 10-CV-5251, 2010 WL 4323264, at *7 (S.D.N.Y. Nov. 1. 2010) (holding that overseas defendant listing American Depositary Shares on the New York Stock Exchange and employing attorneys and a process agent in connection therewith did not subject defendant to jurisdiction in New York). Moreover, Miller's counsel effectively conceded at oral argument Miller's only basis for personal jurisdiction over ULA at this time is the forum selection clause in the Separation Agreement. See Transcript dated Feb. 8, 2018 at 6:1-5, ECF No. 40.

Moreover, even if this Court did have jurisdiction over Phoenix Global, the Court would dismiss Counts IV and V for failure to state a claim for (among other things) the same reasons that it dismissed Counts II and III.