UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
August Term, 2022
(Submitted: March 28, 2023     Decided: September 20, 2023)
Docket Nos. 22-225-cv, 22-232-cv

─────────────────────

RED TREE INVESTMENTS, LLC,
*Plaintiff-Appellee,*

v.

PETRÓLEOS DE VENEZUELA, S.A.,
*Defendant-Appellant,*

PDVSA PETRÓLEO, S.A.,
*Defendant.*[*]

─────────────────────

Before:       SACK, LOHIER, AND CARNEY, *Circuit Judges.*

In 2015 and 2016, Defendant-Appellant Petróleos de Venezuela, S.A. ("PDVSA"), an oil company wholly owned by the Bolivarian Republic of Venezuela, entered into two Note Agreements and a Credit Agreement with the predecessor-in-interest to now-Plaintiff-Appellee Red Tree Investments, LLC ("Red Tree").[†]  Between November 2017 and March 2018, PDVSA became delinquent on its obligations under the contracts.  Red Tree's predecessor-in-interest accelerated the outstanding debt in March 2018, and in February 2019, Red Tree initiated these actions in Supreme Court, New York County, which Defendants removed to the United States District Court for the Southern District of New York.

PDVSA claims that any further payment under the Agreements was impossible and should therefore be excused.  But in December 2021, the district court (Castel, *J.*) granted summary judgment against PDVSA on the grounds that

─────────────────────

[*]  The Clerk of Court is respectfully directed to amend the caption as set forth above.

[†] Red Tree's predecessor-in-interest, and the party with which PDVSA initially entered into the Note and Credit Agreements, was General Electric Capital Corporation and its affiliates.  The contracts were assigned to Red Tree in 2019.

PDVSA had failed to provide sufficient evidence that payment was impossible, or in the alternative, that any impediment to payment was not reasonably foreseeable. It therefore entered judgment in favor of Red Tree and imposed post-judgment interest accruing at a rate of 8.5% on the Note Agreements and 9.5% on the Credit Agreement.

On appeal, PDVSA contends that the district court erred in concluding that no reasonable trier of fact could find that payment was impossible or that U.S. sanctions were unforeseeable. PDVSA further asserts that the district court incorrectly calculated post-judgment interest. However, we agree with the district court that payment by PDVSA was not impossible, and because we further conclude that the district court did not err in its calculation of post-judgment interest, we

AFFIRM the judgments of the district court.

Dennis H. Tracey, III, Matthew Ducharme, Hogan Lovells US LLP, New York, NY; Jessica A.B. Livingston, Hogan Lovells US LLP, Denver, CO, *for Defendants-Appellants*;

Steven F. Molo, Justin M. Ellis, Lauren F. Dayton, Mark W. Kelley, MoloLamken LLP, New York, NY; Elizabeth K. Clarke, MoloLamken LLP, Chicago, IL, *for Plaintiff-Appellee*.

SACK, *Circuit Judge*:

In 2015 and 2016, Defendant-Appellant Petróleos de Venezuela, S.A. ("PDVSA"), [1] an oil company wholly owned by the Bolivarian Republic of Venezuela, entered into two Note Agreements and a Credit Agreement with the predecessor-in-interest to now-Plaintiff-Appellee Red Tree Investments, LLC ("Red Tree"),[2] for a principal amount of over $500 million. Between November 2017 and March 2018, PDVSA became delinquent on its obligations under the contracts. Red Tree's predecessor-in-interest accelerated the outstanding debt in March 2018, and in February 2019, Red Tree initiated these actions in Supreme Court, New York County,[3] and Defendants removed them to the United States District Court for the Southern District of New York.

---

[1] Defendant PDVSA Petróleo, S.A. decided not to appeal the district court's award of summary judgment. *See* Appellant Br. 1 n.2

[2] Red Tree's predecessor-in-interest, and the party with which PDVSA initially entered into the Note and Credit Agreements, was General Electric Capital Corporation and its affiliates. The contracts were assigned to Red Tree in 2019.

[3] Red Tree brought claims against PDVSA in two separate actions, one of which involved PDVSA's alleged default on the Note Agreements (case number 22-225), and the other of which involved PDVSA's alleged default on the Credit Agreement (case number 22-232). The parties and district court adopted the practice of addressing both cases together, and as a result, identical documents were often filed under both case numbers. We have retained the practice here and address both cases together in this opinion, sometimes referring to "this appeal" or "this case," for example, to include both cases. As the appendices filed differ, though, we adopt the convention used by the parties and refer to "App'x 1" and "Spec. App'x 1" for documents filed in case number 22-225 and "App'x 2" and "Spec. App'x 2" for documents filed in case number 22-232.

PDVSA asserted that its failure to pay should be excused under New York law because of "impossibility." But in December 2021, the district court (Castel, *J.*) granted summary judgment against PDVSA on the grounds that PDVSA had failed to provide sufficient evidence that payment was impossible, or in the alternative, that any impediment to payment was not reasonably foreseeable. The court therefore entered judgment in favor of Red Tree, including post-judgment interest accruing at a rate of 8.5% on the Note Agreements and 9.5% on the Credit Agreement as prescribed by the agreements between the parties.

On appeal, PDVSA contends that the district court erred in concluding that payment was not impossible and that U.S. sanctions were reasonably foreseeable. PDVSA also argues that the district court incorrectly calculated the post-judgment interest award. Because we conclude that the district court was correct in holding that payment was not impossible, and because the district court correctly calculated post-judgment interest, we affirm the judgments of the district court. We need not and do not reach the issue of foreseeability.

## BACKGROUND

### I.     The Agreements

A. <u>2015 Note Agreement</u>

On March 27, 2015, PDVSA entered into a Note Agreement (the "2015 Note Agreement" or "2015 Agreement") with General Electric Capital Corporation ("GE Capital"), for which PDVSA Petróleo, S.A. ("Petróleo"), served as Guarantor.  Two notes issued by PDVSA pursuant to the 2015 Agreement are at issue here: the so-called "R-2 Note" and the "R-3 Note" (together, the "2015 Notes").  The principal sum of the R-2 Note was approximately $131.9 million, and GE Capital served as Noteholder.[4]  The principal sum of the R-3 Note was approximately $124.7 million, and SACE S.p.A. served as Noteholder.[5]  Interest on the unpaid principal balance of these Notes accrued at a prescribed rate of 6.5% per annum.

Under the terms of the 2015 Note Agreement, PDVSA agreed to make thirteen payments to each of GE Capital and SACE S.p.A., eleven of which would count toward PDVSA's obligations for both interest and principal,

---

[4] GE Capital EFS Financing, Inc. ("GE Capital EFS") inherited the R-2 Note in November 2015 when GE Capital EFS became the successor to GE Capital.

[5] SACE S.p.A. later assigned its interest to GE Capital EFS.

3

according to a schedule memorialized in Exhibit A of the Agreement. *See* App'x 1 at 51 (Sections 2.02 and 2.03 of the Note Agreement, establishing rules for repayment of and interest on the 2015 Notes); *id.* at 130, 134 (Exhibit A, repayment schedules for the 2015 Notes); *id.* at 128–29, 132–33 (2015 Notes). In the event of overdue payment on either the principal or the interest, the 2015 Agreement specified that interest would accrue on "all amounts outstanding" "after as well as before judgment" at a default rate of 8.5% per annum. App'x 1 at 51. Further, the 2015 Notes contained acceleration clauses which stated that, "[i]f an Event of Default . . . occurs and is continuing, the principal of this Note, together with all accrued and unpaid interest hereon, may be declared or otherwise become due and payable in the manner, and with the effect provided in the Note Agreement." App'x 1 at 129, 133.

B. 2016 Note Agreement

On May 13, 2016, PDVSA entered into a second Note Agreement (the "2016 Note Agreement" or "2016 Agreement") with GE Capital EFS Financing, Inc. ("GE Capital EFS"), for which GE Capital EFS served as Initial Noteholder and Administrative Agent, PDVSA served as Issuer, and Petróleo served as Guarantor. The principal sum of the Note issued pursuant to this Note

Agreement (the "2016 Note") was approximately $194 million.  Other relevant terms of the 2016 Agreement—including the ordinary and default interest rates, number of scheduled payments, and potential for acceleration—were identical to those contained in the 2015 Agreement.

C.  The Credit Agreement

On December 27, 2016, PDVSA entered into a Credit Agreement with GE Capital EFS, for which Petróleo again served as Guarantor.  Under the terms of this Agreement, GE Capital EFS would extend up to approximately $96.9 million in credit to PDVSA.  Disbursement of funds was to follow a four-part schedule. Pursuant to this schedule, between December 2016 and May 2017, GE Capital EFS distributed a total of $81.4 million.

Under the terms of the Credit Agreement, ordinary interest accrued on the unpaid principal at a rate of 7.5% per annum.  In the event of overdue payment on "[a]ny amount of principal . . . or interest," the Credit Agreement prescribed that the "amount . . . not paid when due . . . shall thereafter bear interest at" the default rate, defined as 9.5% per annum.  App'x 2 at 61; *see also id.* at 45 (defining "Default Rate" as "the Interest Rate plus 2.00% per annum").

The Credit Agreement, like the Note Agreements, contained an

acceleration clause which stated that, "[i]f any Event of Default occurs and is

continuing," the lenders could "declare all or any portion of the unpaid and

outstanding principal amount of the Loan, all interest accrued and unpaid

thereon, and all other amounts owing or payable hereunder to be immediately

due and payable." App'x 2 at 86. Finally, under Section 8.05, an Event of Default

under the Credit Agreement would "constitute an Event of Default . . . under the

Note Agreements," too. *Id.* at 87.

D. Executive Order 13808

PDVSA successfully made several payments pursuant to the Note

Agreements and Credit Agreement. But between November 2017 and March

2018, PDVSA became delinquent on its obligations under the contracts.

PDVSA asserts that payment became impossible because, in response to a

sanctions program imposed against Venezuela and PDVSA by the President of

the United States, banks became hesitant to do business with PDVSA. On

August 24, 2017, the Trump Administration issued Executive Order ("E.O.")

13808, which prohibited transactions of "new debt" between United States

persons or entities and PDVSA.[6]  Imposing Additional Sanctions With Respect to the Situation in Venezuela, Exec. Order No. 13808, 82 Fed. Reg. 41,155, 41,155 (Aug. 24, 2017).  The E.O. prohibited, in relevant part, "[a]ll transactions related to, provision of financing for, and other dealings in . . . new debt with a maturity of greater than 90 days of [PDVSA]" "by a United States person or within the United States."  *Id.*

The E.O. did not define "new debt."  However, a "Frequently Asked Questions" ("FAQs") document issued by the U.S. Office of Foreign Assets Control ("OFAC") states that, for purposes of E.O. 13808, "OFAC does not consider debt that was created prior to August 25, 2017 to be 'new debt' . . . so long as the terms of the debt instrument (including, for example, the length of the repayment period or any interest rate applied) agreed to by the parties do not change on or after August 25, 2017."[7]  Spec. App'x 1 at 9 ("FAQ 553").  In these

---

[6] E.O. 13808 was issued by the President pursuant to the executive powers vested in him under Article II of the Constitution; the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.* (IEEPA); the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*; and 3 U.S.C. § 301. *See* Imposing Additional Sanctions With Respect to the Situation in Venezuela, Exec. Order No. 13808, 82 Fed. Reg. 41,155, 41,155 (Aug. 24, 2017).

[7] The President, in E.O. 13808, authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including promulgating rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to implement this order."  Imposing Additional Sanctions With Respect to the Situation in Venezuela, 82 Fed. Reg. at 41,156.  And under 31 C.F.R. § 591.802, "[a]ny action that the Secretary of the Treasury is

7

appeals, PDVSA does not argue that its debt under the Note and Credit Agreements is prohibited new debt under E.O. 13808.

In response to E.O. 13808, banks adopted internal risk-management policies that were designed to ensure that any transactions that the banks conducted conformed with OFAC requirements. And while E.O. 13808 provided a regulatory floor, banks could—and did—enact stricter policies that "combined the threshold regulatory requirements with the banks' unique risk tolerance factors." *Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, 574 F. Supp. 3d 217, 220 (S.D.N.Y. 2021), *aff'd*, --- F.4th --- (2d Cir. Sept. 20, 2023). [8] Typically, if a bank was asked to process a payment to or from PDVSA as the originator, intermediate, or recipient (i.e., beneficiary) bank,[9] that bank would flag the

---

authorized to take pursuant to . . . Executive Order 13808 of August 24, 2017 . . . may be taken by the Director of OFAC or by any other person to whom the Secretary of the Treasury has delegated authority so to act." Delegation of certain authorities of the Secretary of the Treasury, 31 C.F.R. § 591.802 (2023).

[8] Cases involving PDVSA have occasionally used slight variations in formatting the company's name. For consistency and convenience, this opinion uses "Petróleos de Venezuela, S.A." in all citations to these cases.

[9] We have previously explained the mechanics of an electronic fund transfer ("EFT") as follows:

> An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank, that bank simply debits the originator's account and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the

payment and analyze whether it violated E.O. 13808 or that bank's internal risk measures. If the payment was deemed acceptable under both policies, payment could proceed; if it failed under both, it would be rejected. But "[a]s some banks are more risk adverse [sic] than others, some policies were more restrictive than E.O. 13808." *Dresser-Rand Co.*, 574 F. Supp. 3d at 220. Thus, in some circumstances, a bank could refuse to process a payment on risk-management grounds even if the transaction would not violate federal sanctions.

Finally, on November 1, 2018, President Trump issued E.O. 13850, which blocked any United States person or entity from transferring, paying, or otherwise dealing in the "property and interests in property" of "blocked" persons. Blocking Property of Additional Persons Contributing to the Situation

---

same wire transfer consortium. If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account. If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank. To use an intermediary bank to complete the transfer, the banks must each have an account at the intermediary bank (or at different banks in the same consortium). After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account. The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients.

*Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009).

in Venezuela, Exec. Order No. 13850, 83 Fed. Reg. 55,243, 55,243 (Nov. 1, 2018).

On January 28, 2019, OFAC designated PDVSA as a blocked person pursuant to

E.O. 13850.[10]  But that same day, OFAC also issued General License 9, which

authorized transactions "that are ordinarily incident and necessary to dealings in

any debt" of PDVSA that had been "issued prior to August 25, 2017."

Publication of Venezuela Sanctions Regulations Web General License 9 and

Subsequent Iterations, 87 Fed. Reg. 62,020, 62,021 (Oct. 13, 2022) (referencing Off.

of Foreign Assets Control, General License No. 9: Authorizing Transactions

Related to Dealings in Certain Securities (Jan. 28, 2019)).[11]

## II.    Attempts at Payment and Default

PDVSA avers that payment toward the Note Agreements or Credit

Agreement became impossible following the issuance of E.O. 13808 and E.O.

13850 because banks' internal risk-management policies prevented such

transactions.  But both before and after the President issued E.O. 13808, PDVSA

---

[10] Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Venezuela's State-Owned Oil Company Petroleos de Venezuela, S.A. (Jan. 28, 2019), https://perma.cc/T3AE-PMAU.

[11] General License 9 has expired and been superseded by General License 9G, which remains in effect today.  *See* Publication of Venezuela Sanctions Regulations Web General License 9 and Subsequent Iterations, 87 Fed. Reg. 62,020, 62,020 (Oct. 13, 2022); Off. of Foreign Assets Control, General License No. 9G: Authorizing Transactions Related to Dealings in Certain Securities (May 12, 2020), https://perma.cc/7P4F-2QL9.

successfully initiated transfers from its bank accounts to recipient banks via intermediaries in connection with the agreements at issue here.

Three banking transactions are of particular relevance to the impossibility defense raised on this appeal. First, on September 29, 2017, PDVSA attempted to make a payment to GE Capital EFS in connection with the 2016 Note Agreement. But Deutsche Bank, which was serving as the intermediate institution, rejected the transaction. Ultimately, this payment was successfully processed at a later date.[12]

Second, on October 4, 2017, Deutsche Bank rejected another attempted payment by PDVSA, this time toward the Credit Agreement. The payment was successfully processed a day later, however, after involvement by GE Capital EFS.

Third, on March 21, 2018, PDVSA again attempted to wire a payment owed under the Credit Agreement. But this payment was rejected by Zuma Bank (the originating bank) on April 13, 2018, "due to risks arising out of the imposition of" U.S. sanctions. App'x 1 at 1415. Zuma Bank had, though,

---

[12] The parties dispute the reason that this transaction was later successfully processed. PDVSA states that the "payment was eventually processed after involvement from GE Capital EFS," whereas Red Tree asserts that "the payment was processed after PDVSA used CITIC Bank as an intermediary absent any involvement from GE Capital EFS." App'x 1 at 1529–30.

successfully processed payments to GE Capital EFS's Deutsche Bank account via Dinosaur Merchant Bank Limited ("DMBL") on September 25, 2017 and March 12, 2018. Furthermore, banks including DMBL, Gazprombank, China CITIC Bank, Lloyds Bank, and the Bank of New York Mellon had also served as originating and intermediate banks on behalf of PDVSA after E.O. 13808 was issued.

Months before the third of these transactions, on November 15, 2017, PDVSA failed to make a payment required under the Credit Agreement. PDVSA wrote to GE Capital EFS on December 4, 2017, and explained that E.O. 13808 had "materially affected . . . its ability to timely satisfy the payments derived from the Credit Agreement." App'x 1 at 1405. It stated that the sanctions caused "financial institutions [to] take longer to process routine transfers involving PDVSA," even though those transfers were "legitimate and permissible under all applicable laws." *Id.* PDVSA therefore requested "a waiver of 30 additional days . . . to remedy the delay in the aforesaid payments." *Id.*

GE Capital EFS refused PDVSA's request on December 8, 2017. GE Capital EFS "acknowledge[d] that political developments in recent months [i.e., United States sanctions] . . . created logistical difficulties for [PDVSA] in the making and

processing of payments." App'x 1 at 1407. But it also noted that PDVSA's delay

in payment had "real financial implications" for GE Capital EFS. *Id.* It therefore

reserved the right to exercise remedies available to it under the Credit

Agreement but noted that, should "commercial discussions continue to progress

in a timely and positive manner," it could "elect in its sole discretion to refrain

from exercising" such remedies. *Id.* at 1408.

GE Capital EFS thereafter sent notices of non-payment to PDVSA on

January 5, 2018, and again on March 15, 2018. In the letters, GE Capital EFS

warned that "pursuant to Section 8.05 . . . of the Credit Agreement, the

occurrence of an Event of Default under this Credit Agreement also

automatically triggers an Event of Default" under both the 2015 and 2016 Note

Agreements. App'x 2 at 163. GE Capital EFS requested that PDVSA remedy its

delinquency within three days, which PDVSA failed to do. GE Capital EFS

accelerated the debt on March 19, 2018, and declared all loans made under the

Credit Agreement—including "the principal [and] all accrued and default

interest thereon"—"to be immediately due and payable." *Id.* at 167.

With respect to the 2016 Note Agreement, PDVSA failed to make a

required payment on December 27, 2017. On January 5, 2018, GE Capital EFS

sent PDVSA a formal notice of default on the 2016 Note. In the letter, GE Capital EFS requested that PDVSA remedy its default within five days. After PDVSA failed to do so, GE Capital EFS issued a notice of acceleration on March 19, 2018, in which it declared the balance of the Note—including "the principal, accrued and default interest thereon, and any unpaid accrued fees"—immediately due and payable. App'x 1 at 287.

Finally, regarding the 2015 Note Agreement: The Notes issued pursuant to that Agreement matured on March 27, 2018, at which point all amounts thereunder became due and payable. PDVSA failed to make the required payment by that date, however, and GE Capital EFS consequently sent a notice of missed payment to PDVSA on July 26, 2018.

Since March 2018, PDVSA has not made payments on the 2015 Notes, 2016 Note, or Credit Agreement. On January 25, 2019, GE Capital EFS assigned the Note Agreements and Credit Agreement, as well as its administrative role, to Red Tree.

### III.   Current Litigation

In February 2019, Red Tree initiated these two actions by motion for summary judgment in lieu of complaint in Supreme Court, New York County,

pursuant to N.Y. CPLR 3213. In March 2019, the defendants, PDVSA and

Petróleo, timely removed the cases to the United States District Court for the

Southern District of New York. The district court construed Red Tree's motion

as a motion for summary judgment pursuant to Federal Rule of Civil Procedure

56.

In May 2019, the district court (Nathan, *J.*) granted the defendants' motion

to stay the proceedings for 120 days in light of political instability in Venezuela.

After denying a subsequent request for an additional stay in January 2020, the

district court granted extension requests from PDVSA to complete discovery

relating to the pending motion for summary judgment.

On December 10, 2021, the case was reassigned to Judge P. Kevin Castel.

On December 22, 2021, the district court (Castel, *J.*) issued an opinion and order

in which it concluded that PDVSA had failed to provide evidence that could

entitle it to judgment in favor of its impossibility defense. First, the court found

that although PDVSA had unsuccessfully attempted payment three times, two of

those efforts were ultimately remedied. It concluded that one failed effort,

without more, was insufficient to prove that payment was impossible. In the

alternative, it also concluded that PDVSA failed to demonstrate that U.S.

sanctions were not reasonably foreseeable when the agreements at issue were executed. It therefore granted Red Tree's motion for summary judgment as against PDVSA and Petróleo.

The district court ordered Red Tree to submit proposed final judgments, which Red Tree did on December 23, 2021. On December 30, 2021, PDVSA filed a response to Red Tree's proposed judgments. While PDVSA did not object to Red Tree's calculation of principal or pre-judgment interest, it did object to Red Tree's calculation of post-judgment interest. But on January 6, 2022, the district court adopted Red Tree's proposed judgments in their entirety and entered judgment in favor of Red Tree in the amounts of $157,940,211.36 (case number 22-225) and $88,401,385.88 (case number 22-232), including post-judgment interest to accrue at the rate of 8.5% per annum on the Note Agreements and 9.5% per annum on the Credit Agreement.[13] PDVSA now appeals those judgments.

## DISCUSSION

PDVSA advances three principal arguments on appeal. It claims that the

---

[13] The parties agree that the judgments erroneously omitted $648,070.78 that Defendants owe in interest that accrued between December 23, 2021 (when Red Tree proposed the judgments) and January 6, 2022 (when the district court entered the judgments). We are aware of no reason why the judgments should not be amended, following the issuance of this Court's mandate, to remedy this error.

district court erred in concluding that there was no genuine dispute of fact regarding the impossibility of payment or the foreseeability of sanctions. It also argues that the district court incorrectly calculated post-judgment interest.

For the reasons set forth below, we reject PDVSA's first and third arguments on the merits and conclude that we need not reach the second relating to the foreseeability of sanctions.

## I.    Standard of Review

We review the district court's grant of summary judgment *de novo*. *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 138 (2d Cir. 2017). "[W]e will affirm only if the evidence, when viewed in the light most favorable to the party against whom it was entered, demonstrates that there is no genuine issue as to any material fact and that judgment was warranted as a matter of law." *Id.* "[A] fact is 'material' if it 'might affect the outcome of the suit under the governing law,'" and a "fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Impossibility (also known as "impracticability") is an affirmative defense under New York law against liability for nonperformance of a contractual obligation. *See Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir.

2018); *Knickerbocker Retail LLC v. Bruckner Forever Young Social Adult Day Care Inc.*, 167 N.Y.S.3d 462, 464 (N.Y. App. Div. 2022).[14] Under New York law, "[i]mpossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible." *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987). "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Id*. The defense is available to a party whose performance "is made impracticable without [the party's] fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made." Restatement (Second) of Contracts § 261 (Am. L. Inst. 1981).[15] But "where impossibility or

---

[14] Per the choice-of-law provisions contained in Section 9.07 of the Note Agreements and Section 11.11 of the Credit Agreement, New York law governs this dispute. *See* App'x 1 at 76–77 (2015 Note Agreement) ("[T]his agreement and the other finance documents . . . , and the rights and obligations of the parties hereunder and thereunder shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of New York . . . ." (emphasis omitted)); *id.* at 177 (2016 Note Agreement) (same); App'x 2 at 108 (Credit Agreement) ("This agreement and the rights and obligations of the parties hereunder and thereunder shall be governed by, and shall be construed and enforced in accordance with, the laws of the State of New York . . . ." (emphasis omitted)).

[15] When analyzing contracts governed by New York law, New York courts look to the Restatement of Contracts. *E.g.*, *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998) (relying on various provisions of the Restatement (Second) of Contracts); *Trilegiant Corp. v. Orbitz, LLC*, 5 N.Y.S.3d 366, 367 (N.Y. App. Div. 2015) (citing Restatement (Second) of Contracts § 261).

difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 244 N.E.2d 37, 41 (N.Y. 1968).

The burden of proof to establish an affirmative defense such as impossibility falls on the defendant. *See Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996). PDVSA therefore "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

## II. The District Court Correctly Concluded that There Was No Genuine Dispute of Material Fact as to Whether Payment Was Impossible

PDVSA's primary argument is that, while E.O. 13808 did not make repayment legally impossible, banks' internal risk-management policies made it practically impossible to complete the necessary transactions. To succeed on this defense, PDVSA was required to provide evidence sufficient to raise a genuine dispute of material fact regarding whether "it took virtually every action within its power to perform its duties under the contract," *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990), and that, despite those efforts, performance was

"objectively impossible," *Kel Kim Corp.*, 519 N.E.2d at 296. Under New York law, "[d]ifficulty or improbability of accomplishing the stipulated undertaking" is not enough to make out an affirmative defense of impossibility. *Cameron-Hawn Realty Co. v. City of Albany*, 101 N.E. 162, 163 (N.Y. 1913). Rather, "[i]t must be shown that the thing cannot *by any means* be effected," *id.* (emphasis added), and "[n]othing short of this will excuse nonperformance," *id.* This showing must be made by the party claiming impossibility—here, PDVSA.

PDVSA points to four primary pieces of evidence to corroborate its claim of impossibility. But these pieces of evidence, taken together and viewed in the light most favorable to PDVSA, are insufficient to raise a genuine dispute of material fact as to whether PDVSA "took virtually every action within its power to perform its duties under the contract." *Health-Chem Corp.*, 915 F.2d at 810. While one bank did reject a single payment attempt by PDVSA, other banks were willing to—and, in fact, *did*—process the requested payments. We agree with the district court that these facts are fatal to PDVSA's impossibility defense.

PDVSA first emphasizes that it made all required payments prior to the imposition of sanctions in 2017 and that its failure to pay occurred only after the issuance of E.O. 13808. While this is true, PDVSA successfully made payments

20

*following* the issuance of E.O. 13808, too. This evidence therefore does not indicate that payment was impossible; at most, it suggests that the issuance of sanctions made payment more difficult.

PDVSA next highlights that Deutsche Bank rejected two of its payment attempts, initiated on September 29, 2017, and October 4, 2017, respectively. But as PDVSA admits, "Deutsche Bank later processed [those] payments from PDVSA." Appellant's Br. at 24. These initial rejections therefore cannot provide support for PDVSA's claim of impossibility, as the ultimate processing of those payments proves the transactions were, in fact, possible.

PDVSA also emphasizes correspondence it had with GE Capital EFS in which GE Capital EFS acknowledged that sanctions had "created logistical difficulties for [PDVSA] in the making and processing of payments." App'x 1 at 1407. PDVSA extrapolates from this an argument that payment was impossible. But while such evidence may indicate that successfully completing payments would have proven logistically challenging, it fails to raise a genuine dispute of material fact as to whether payment was objectively impossible.

PDVSA finally points to evidence that Zuma Bank, as originating bank, rejected one attempted payment on April 13, 2018. A Zuma Bank representative

declared that this payment was rejected "due to risks arising out of the imposition of" U.S. sanctions. App'x 1 at 1415. PDVSA claims that this evidence raises a genuine dispute of material fact as to whether Zuma Bank or any other bank would process payments on PDVSA's behalf at that point. We disagree.

While Zuma Bank did refuse to process one payment on April 13, 2018, it had successfully processed payment for PDVSA as recently as September 25, 2017, and March 12, 2018—both after the issuance of E.O. 13808. Furthermore, PDVSA points to no evidence that it attempted to remedy Zuma Bank's one-time risk-based refusal by assuring Zuma Bank that the transaction did not, in fact, violate OFAC sanctions. PDVSA could have, for example, "obtain[ed] an opinion from a reputable counsel in the United States that payment would not violate the sanctions," "post[ed] a letter of credit or indemnity for any losses by a financial institution," "encourage[d] uncooperative banks to avail themselves of OFAC's robust interpretive guidance program," or "sought an even more explicit license from OFAC." *Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*, Nos. 19-cv-2519 (PKC), 19-cv-2523 (PKC), 2021 WL 6092462, at *6 (S.D.N.Y. Dec. 22, 2021). PDVSA claims that these actions would have been futile, as the bank's rejection was due to its internal risk-management policy, not its belief that the transaction

violated federal sanctions.  But as PDVSA acknowledges, the reason that banks

adopted these risk-management measures was to guard against the possibility of

processing a transaction that violated federal sanctions.[16]  To convince Zuma

Bank to process the payment, then, PDVSA could have made assurances that the

transaction did not violate federal sanctions or offered to indemnify the bank,

should it incur any losses from the transaction.  But PDVSA took none of these

measures and points to no other actions it undertook to try to encourage the

processing of that particular Zuma Bank payment.

PDVSA further failed to provide any evidence that other banks would

have refused to initiate or process payments on its behalf.  PDVSA admits that

banks including DMBL, Gazprombank, and China CITIC initiated payments on

its behalf after the issuance of E.O. 13808.  But it protests that, as six months had

passed between those transactions and the Zuma Bank rejection, one cannot

assume that those banks would have continued to initiate transactions on

PDVSA's behalf.  PDVSA also admits, however, that banks including DMBL,

---

[16] PDVSA also argues that it would not make sense for Zuma Bank to process a payment it previously rejected "[a]bsent evidence that sanctions against PDVSA were loosening."  Reply Br. at 10.  Regardless of whether the sanctions were loosening or intensifying, the real question would be whether or not facilitating a transaction for PDVSA would violate those sanctions.  Providing clarification on this topic is exactly what PDVSA should have—but did not—do.

Lloyds Bank, and the Bank of New York Mellon had acted as intermediaries to facilitate the transfer of PDVSA payments after the issuance of E.O. 13808. But it claims that, once Zuma Bank refused to initiate its payment, the willingness of these intermediary banks to facilitate a transaction became "irrelevant." Reply Br. at 10. Despite these arguments, though, PDVSA provides no admissible justification for why these banks could not have served as PDVSA's originating bank going forward, nor does it provide evidence that these intermediate banks did, in fact, change in their willingness to facilitate transfers on behalf of PDVSA. A successful impossibility defense cannot rest on such speculation.

PDVSA complains that it "did not have to submit evidence from every bank in the world establishing that not one of them would have processed the payments" to successfully prove impossibility. Reply Br. at 7. But that is not what the district court suggested, nor what we suggest, was required of PDVSA. PDVSA was simply required to produce sufficient evidence to raise a genuine dispute as to whether banks such as DMBL, Gazprombank, China CITIC, Lloyds Bank, and the Bank of New York Mellon would not process payment on its behalf, despite having done so previously. PDVSA has failed to meet that burden.

Finally, PDVSA argues that, like *Dresser-Rand Co. v. Petróleos de Venezuela, S.A.*, 439 F. Supp. 3d 270, 274–75 (S.D.N.Y. 2020), *aff'd sub nom. Dresser-Rand Co. v. Pdvsa Petróleo, S.A.*, No. 20-1990, 2021 WL 2878936 (2d Cir. July 9, 2021) (summary order), this case should have advanced to trial. But PDVSA bore the burden of proving that *this record* contains evidence sufficient to create a dispute of material fact with respect to impossibility. Regardless of whether such a dispute of material fact existed in *Dresser-Rand Co.*, we agree with the district court that, on this record, PDVSA has failed to demonstrate a dispute of material fact with respect to impossibility.

PDVSA cannot demonstrate impossibility without submitting admissible evidence sufficient to raise a genuine dispute of material fact as to whether "it took virtually every action within its power to perform its duties under the contract," *Health-Chem Corp.*, 915 F.2d at 810, and that, despite those efforts, performance was "objectively impossible," *Kel Kim Corp.*, 519 N.E.2d at 296. Zuma Bank's single rejection, does not show that it—and all other banks—would have refused to serve as issuing or intermediate bank for PDVSA on risk-management grounds. PDVSA therefore failed to meet its evidentiary burden,

and the district court was correct to grant summary judgment in favor of Red Tree.[17]

### III. The District Court Correctly Calculated Post-Judgment Interest

Finally, PDVSA asserts that the district court incorrectly calculated post-judgment interest. According to PDVSA, while default interest should have applied pre-judgment to the overdue payments of principal and ordinary interest owed under the terms of the Note and Credit Agreements, the district court should not have applied default interest post-judgment on top of the default interest that had accrued prior to judgment. In other words, PDVSA argues that pre-judgment default interest should not be compounded post-judgment at the default rate.

#### A. Forfeiture

Red Tree first claims that this argument was waived in the district court as PDVSA raised the issue "for the first time two months after entry of judgment" in a letter asking the district court to correct a "clerical error" in the judgments under Fed. R. Civ. P. 60(a). Appellee's Br. at 44. But this contention

---

[17] Because we affirm the grant of summary judgment on the ground that payment was not impossible, we need not reach the question of whether sanctions were also foreseeable and addressable in the agreements.

26

misconstrues the relevant procedural history. We therefore disagree that

PDVSA's claim is forfeited.

"[I]t is a well-established general rule that an appellate court will not

consider an issue raised for the first time on appeal." *In re Nortel Networks Corp.*

*Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008) (per curiam) (alteration in original)

(citation omitted); *see also Dresser-Rand Co.*, 2021 WL 2878936, at *3 (deeming an

argument forfeited when it "was not fully briefed below [and] the District Court

[did not] have an appropriate opportunity to consider it in the first instance").

Claims properly presented to and considered by the district court,

however, have not been forfeited. Indeed, "[a]rguments made on appeal need

not be identical to those made below . . . if the elements of the claim were set

forth and additional findings of fact are not required." *Vintero Corp. v.*

*Corporacion Venezolana de Fomento*, 675 F.2d 513, 515 (2d Cir. 1982) (per curiam).

And when parties present arguments on appeal that are "no more than a

rewording of points" that they previously raised to the district court, this court

may consider them. *Id.*

The district court granted Red Tree's motion for summary judgment on

December 22, 2021. In its order, the district court solicited proposed final

judgments from Red Tree, to which PDVSA would have seven days to respond.

Red Tree submitted its proposed final judgments to the district court on

December 23, 2021.  In a letter to the district court filed on December 30, 2021,

PDVSA responded to Red Tree's proposed final judgments and stated that, while

it did not oppose Red Tree's calculation of principal and pre-judgment interest, it

did "oppose the manner in which the Proposed Judgments would calculate post-

judgment interest."  App'x 1 at 2174.  Specifically, PDVSA protested that:

> Pursuant to the express terms of the Agreements, the default interest rates specified therein only apply to the *amounts due under the Agreements* both before and after judgment, which is entirely different than specifying that the contractual default interest rates shall be used as the post-judgment interest rate to be applied on the entire judgment amount. In other words, the Agreements provide that default interest accrues in the same exact manner, and in the same exact amounts, both before and after entry of judgment.

> The terms of the Agreements in no way indicate that the parties intended that the entry of judgment would create an inflection point where default interest would begin accumulating on top of default interest that had already accrued as of the date of judgment, which is exactly what would happen under Red Tree's Proposed Judgments.

*Id.* at 2174–75 (internal citations omitted).

The district court issued its final judgments on January 6, 2022, following

its receipt of PDVSA's letter.  Specifically, the district court ordered that "post-

judgment interest from the date of this judgment will accrue at the 8.5% default

interest rate as provided in § 2.04 of the . . . Note Agreement[s]," Spec. App'x 1 at 19, and "at the 9.5% default interest rate as provided in § 2.05(c) of the Credit Agreement," Spec. App'x 2 at 19.

On March 4, 2022, after the district court issued the judgments, PDVSA filed another letter, in which it expressed concern that the district court did "not issue an accompanying opinion or otherwise state whether and for what reasons it agreed with either party's view on how interest is to be calculated." App'x 1 at 2242. It again "submit[ted] that default interest accrues in the same manner and amount both before and after entry of judgment" and cautioned that PDVSA should not be subject to "default interest that compounds once a final judgment is entered." *Id.* Red Tree wrote in response that PDVSA's request to change the calculation of post-judgment interest was improper under Rule 60(a) and that, moreover, in light of the instant appeals (which by that point were pending), the Second Circuit was "the proper forum to hear this issue." *Id.* at 2244. At the invitation of the district court, the parties submitted additional letters in support of their positions, but the district court neither ruled on the issue nor responded to the parties' arguments.

Despite previously contending that this Court should decide the merits of Red Tree's interest argument, *see id.*, Red Tree now argues that we should decline to consider PDVSA's argument because PDVSA's efforts to communicate its concern to the district court were "isolated, conclusory, and untimely" and therefore insufficient to preserve the issue for appeal, Appellee's Br. at 44. But Red Tree cannot have it both ways. PDVSA raised this very argument, albeit using different words, both before and after judgment was issued.

We conclude that PDVSA sufficiently presented its argument regarding post-judgment interest to the district court and preserved its claim for appeal. The district court sought PDVSA's views on how to properly calculate the total judgment amount, and after receiving Red Tree's proposal, PDVSA timely objected in writing to the proposal that, upon entry of judgment, "default interest would begin accumulating on top of default interest." App'x 1 at 2175. While this language is not identical to the language PDVSA uses in its appellate brief, *see* Appellant's Br. at 35 (objecting to "default interest that compounded on the date of judgment"), the substance of the argument is the same. We will therefore consider PDVSA's contention here.

B. <u>Merits</u>

PDVSA correctly observes that under New York law's default rule, plaintiffs are not entitled to compound interest on judgments.  *See Rourke v. Fred H. Thomas Assocs.*, 627 N.Y.S.2d 831, 832 (N.Y. App. Div. 1995) (holding that, "in the absence of an express agreement for either compound interest or interest on interest, or statutory authority, such interest is not recoverable" (citation omitted)).  But, as it acknowledges, parties are free to contract around this default rule.  We therefore start our analysis with the text of the Note Agreements and Credit Agreement signed by the parties, which we review *de novo*.  *See Fireman's Fund Ins. Co. v. TD Banknorth Ins. Agency Inc.*, 644 F.3d 166, 169 (2d Cir. 2011).

Under New York law, a contract's "words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 95 (2d Cir. 2021) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)); *see also Am. Exp. Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990) ("A contract should be construed so as to give full meaning and effect to all of its

31

provisions. Words and phrases are given their plain meaning." (internal citations omitted)). "In New York, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Postlewaite v. McGraw–Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) (citation and internal quotation marks omitted).

Section 2.04 of the 2015 and 2016 Note Agreements provides that, in the event of PDVSA's default, "all amounts outstanding under this Agreement . . . shall bear interest (after as well as before judgment) . . . at a rate per annum equal to eight and one-half percent." App'x 1 at 51, 151. Section 2.05(b) of the Credit Agreement similarly dictates that "[a]ny amount of principal of or interest in respect of a Loan or any other amount payable by the Borrower under this Agreement that is not paid when due . . . shall thereafter bear interest at an interest rate per annum which is equal to the Default Rate," defined as 9.5% per annum. App'x 2 at 61; *see also id.* at 45. The contracts therefore confirm that, in the event of late payment, "all amounts outstanding" and "any amount of

principal of or interest . . . or any other amount payable" will accumulate interest at the default rate.

This language is broad. The contracting parties could have agreed, for example, that only the "principal" or "principal and ordinary interest" would accrue additional interest at the default rate following any judgment. But "*all* amounts outstanding" and "*[a]ny* amount of principal of or interest . . . or *any* other amount payable" are inclusive terms, and we assume the parties used this language intentionally when drafting the agreements. *See Donohue v. Cuomo*, 184 N.E.3d 860, 866 (N.Y. 2022) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent and [t]he best evidence of what parties to a written agreement intend is what they say in their writing." (internal quotation marks omitted and alteration in original)).

PDVSA contends that these terms must include only past due payments of principal and ordinary interest. Under its interpretation, the contractual default rates should not apply to accrued default interest, either before or after judgment. And according to PDVSA, default interest cannot be "outstanding" at

any particular time because that interest had no due date under the contracts and was payable on demand.

This interpretation, however, is incorrect. First, Red Tree's predecessor-in-interest did demand payment of this default interest when it accelerated the debt under the 2016 Note Agreement and Credit Agreement and thereafter filed suit to collect all unpaid principal and interest. *See* App'x 1 at 287 (seeking payment of "the principal, accrued and default interest thereon, and any unpaid accrued fees" under the 2016 Note Agreement); App'x 2 at 167 (seeking payment of "the principal [and] all accrued and default interest" under the Credit Agreement). Moreover, the contractual provisions at issue provide that the default interest rate applies to overdue payments of interest, and the provisions do not *exclude* accrued default interest from their ambit. Because the contracts provide that the default interest rate applies to overdue payments of interest, without limitation, the contracts authorize default interest on default interest. PDVSA attempts to twist this language so that it excludes pre-judgment default interest, but the plain

language of the Note Agreements and Credit Agreement belies this post hoc differentiation of interest types.

We therefore conclude that, under the plain language of the Note and Credit Agreements, the outstanding principal and interest that accrued pre-judgment—including both default and ordinary interest—are subject to default interest post-judgment. *Compare Themis Cap., LLC v. Democratic Republic of Congo*, 626 F. App'x 346, 349 (2d Cir. 2015) (summary order) (concluding that a contractual term providing for "the payment of interest on 'all interest which is not paid when due hereunder,' without limitation," entitled plaintiffs to compound interest, i.e., interest on already accumulated interest) (emphasis omitted)), *with DRAW Cap. Partners, LLC v. Republic of Argentina*, No. 18-CV-548 (LAP), 2018 WL 5777024, at *3 (S.D.N.Y. Nov. 2, 2018) (concluding that compound interest was not recoverable when the plain language of the contract did not specify the rate of interest to be imposed on overdue interest). Including default interest in the judgment amounts and then imposing default interest on the total judgment does compound default interest. But New York permits recovery of such compound interest when there is an express agreement to do so, as there is here. *See Rourke*, 627 N.Y.S.2d at 832; *United States v. Hannon*, 728 F.2d

35

142, 145 (2d Cir. 1984) (reversing the denial of post-judgment interest on the entire judgment amount—including both principal and accumulated interest—and correcting the "mistaken belief that New York law does not permit the awarding of interest on interest"). The contracts provide that default interest accrues on "all amounts outstanding" and "[a]ny amount of principal . . . or interest" without limitation as to the type of interest or amount. To properly give force to the Note and Credit Agreements' terms, then, default interest must apply to "all" unpaid amounts, including pre-judgment default interest.

The terms of the contracts regarding default interest plainly apply to the entire amount owed by PDVSA to Red Tree—to unpaid principal, ordinary interest, and default interest accrued pre-judgment. We therefore affirm the district court's calculation of post-judgment interest.

## CONCLUSION

We have considered PDVSA's remaining arguments on appeal and conclude that they are without merit. For the reasons explained above, we AFFIRM the judgments of the district court.